TOWN OF ELLINGTON, Respondent, vs. INDUSTRIAL COMMISSION, Appellant: TOWN OF DALE and another, Defendants.

*April 29—May 25, 1937.*

For the appellant there was a brief by *Walter Melchior* of New London, attorney for the town of Dale, and the *Attorney General, Warren H. Resh,* assistant attorney general, and *Norris E. Maloney* of Madison, attorneys for the Industrial Commission, and oral argument by *Mr. Melchior* and *Mr. Maloney.*

For the respondent there was a brief by *Oscar J. Schmiege* of Appleton, attorney, and *Harold M. Wilkie* of Madison of counsel, and oral argument by *Mr. Schmiege* and *Mr. W. E. Torkelson* of Madison.

WICKHEM, J.  Herbert Borgwardt and his family were residents of the town of Dale from 1913 to April 6, 1930. During all of this period Borgwardt was engaged in the operation of a blacksmith shop and was self-supporting. Sometime prior to April 6, 1930, he disposed of the shop for the sum of $500 and moved to the city of Milwaukee, where he resided for approximately eleven months, during which

time the family was supported by the proceeds of the sale and such employment as Borgwardt could obtain in the city of Milwaukee. During this period the Borgwardt family received some gifts from relatives in the form of clothing and food. By March 5, 1931, Borgwardt had exhausted his resources except the cash surrender value of two insurance policies upon his life and a few items of personal property. On or about that time he moved to the city of Oshkosh, the cost of transportation being supplied by his father-in-law. The family resided in Oshkosh for about three months, and during that time his rent and light bills were paid, and food for the family furnished, by his father-in-law. No application was made for relief either to the city of Oshkosh or to any charitable or benevolent institution or organization. On or about May 15, 1931, Borgwardt purchased a blacksmith shop in the town of Ellington, the purchase price being $250, of which $20 was paid in cash and the rest of the purchase price "worked off." During the following months, Borgwardt had some income from the blacksmith business and other work, but the major part of his support was furnished him by his father-in-law. No requests were made for relief or assistance to any public agency or private charity during the residence of the family in Ellington. On November 5, 1932, after a residence of approximately seventeen months in Ellington, Borgwardt and his family returned to the town of Dale. By this time one of his policies had been cashed and the proceeds applied to the premiums upon the other policy. After moving to the town of Dale, the last policy was cashed and the proceeds used for support of the family. Borgwardt occupied a house in Dale owned by Borgwardt's father-in-law. Upon his last removal, Borgwardt disposed of his automobile and other items of personal property and obtained sufficient money to support himself for a time. The father-in-law continued to supply money to the extent of five or ten dollars a month. In the

spring of 1933, before the Borgwardt family had been in Dale a year, they received from the town officials of Dale four bags of Red Cross flour. This was given to the family at the request of Mr. Borgwardt. In June, 1933, having lived in the town of Dale for somewhat less than a year, written application was made by Borgwardt to the town of Ellington for relief, but this application was refused. Application was made to the town of Dale for relief on November 8, 1933, one year and three days subsequent to his removal to that town. On March ·1, 1934, he again applied for relief to the town of Dale, and since that time has been on relief continuously. It was stipulated by the parties that the statutory notice pursuant to sec. 49.03 (3), Stats., was properly served by the town of Dale on Outagamie county, and by the county upon the town of Ellington. It was further stipulated that the county of Outagamie had reimbursed the town of Dale for relief given to the Borgwardts to the extent of $142.81, and that the town of Ellington has failed to pay the county of Outagamie that sum. The town of Ellington has also failed to reimburse the town of Dale for the balance of the relief furnished, amounting to $396.32.

This appeal involves the applications of sec. 49.02 (4) and (7), Stats., which read as follows:

"(4) Every person of full age who shall have resided in any town, village, or city in this state one whole year shall thereby gain a settlement therein; *but no residence of a person in any town, village, or city while supported therein as a pauper . . . shall operate to give such person a settlement therein.* The time spent by any person as an inmate of any home, asylum or institution for the care of aged, neglected or indigent persons, maintained by any lodge, society or corporation, or of any state or United States institution for the care of veterans of the military and naval service shall not be included as part of the year necessary to acquire a legal set-

tlement in the town, city or village in which said home, asylum or institution is located, nor shall such time so spent be included as part of the year necessary to lose a legal settlement in any other town, city or village of this state. The time spent by any person, while residing or while employed on any Indian reservation over which the state has no jurisdiction, shall not be included as part of the year necessary to acquire a legal settlement in the town, city, or village in which said reservation is located, nor shall such time so spent be included within the year necessary to lose his legal settlement in any other town, city, or village of this state."

"(7) Every settlement when once legally acquired shall continue until it be lost or defeated by acquiring a new one in this state or by voluntary and uninterrupted absence from the town, village, or city in which such legal settlement shall have been gained for one whole year or upward; and upon acquiring a new settlement or upon the happening of such voluntary and uninterrupted absence all former settlements shall be defeated and lost."

The purpose of this statute is thus described in *Rolling v. Antigo,* 211 Wis. 220, 222, 248 N. W. 119, 120:

"The statute in question is designed to fasten liability for support of a citizen who falls below the level of subsistence, upon the political subdivision in which he has his settlement at the time when he becomes dependent. If a person has had his productive years in one political subdivision or is on the way to a recovery to become self-supporting, it is no more than just and proper that the community in which he has lived should bear the burden resulting from his misfortune or incapacity. The statute in question was designed to prevent one municipality from shifting this burden upon another, and the test set up for the acquirement of a settlement by a person who is receiving aid is for the purpose of determining which municipality shall be liable. . . ."

The liability of the town of Ellington for relief furnished by the town of Dale depends on whether Borgwardt had a legal settlement in Ellington at the time the relief was given.

The principal claim by the appellant in this case is that Borgwardt, having lived in the town of Ellington for seventeen months without receiving public relief, gained a settlement in that town. It is the position of the town of Ellington: (1) That Borgwardt, having been principally supported during his residence in Ellington by his wife's father, who had no legal obligation to support him, gained no settlement there because he was being supported as a pauper; and (2) that if this be not so, Borgwardt had resided in Dale after his removal from Ellington for more than a year without being supported there as a pauper.

The question presented is a troublesome one. Borgwardt was concededly not a pauper during his original residence in Dale, nor is there any evidence that he had achieved this status before coming to Ellington, although it is manifest that his financial condition was becoming progressively worse. Does the fact that he received the major portion of his family's support from his father-in-law after his removal to Ellington warrant the conclusion that they were being supported in that town as paupers, although no request was ever made to the public authorities or to any private charity for relief or assistance? We think that this question must receive a negative answer. It is held in this state that one who receives support from relatives who have a moral or a legal obligation to come to his assistance does not thereby become a pauper. In *Holland v. Belgium,* 66 Wis. 557, 559, 29 N. W. 558, the court said, after reciting the financial condition of the alleged pauper:

"But, notwithstanding this apparently helpless condition of the family, the evidence on the part of the defendant shows that Becker had some money and real and personal property, which had enabled him, with the aid of some of his relations, to support himself and family up to the time when the town of Holland furnished the articles above mentioned. . . ."

In *Monroe County v. Jackson County,* 72 Wis. 449, 457, 40 N. W. 224, it was said:

"We do not think that the support of a mother by her daughter should be deemed in the law a merely charitable support, within the rule stated in the case of *Saukville v. Grafton,* 68 Wis. 192, at p. 195."

We do not attempt here to determine whether Borgwardt's father-in-law had a moral obligation to furnish food, clothing, and other items of support to Borgwardt, although a persuasive argument might be made in support of an affirmative answer. We do not deem the answer to this question determinative. The point is that the parties were in such relationship as to lead inevitably to the conclusion that the support was not furnished for a charitable purpose, but rather to prevent Borgwardt from becoming a pauper and to avoid the necessity of a resort by him to the public authorities for relief. Where one responds to the calls of friendship or such a relationship as is here involved to prevent a friend or relative from becoming a public charge, the motive is that of affection or family pride rather than charity as the latter term is commonly understood, and, especially in view of the economic emergencies created by the depression, it would be a startling and extraordinary distortion of the purpose of such gifts and the sense in which the term "pauper" is commonly understood to hold that the beneficiaries were being supported as paupers. This is especially true where the person benefited had never theretofore achieved the status of pauper. It may well be that, where one already has such a status, a different conclusion may be warranted by the facts of a particular case. It was held in the *Rolling Case, supra,* that one having the status of a pauper, who was supported by a voluntary charitable institution, was being supported as a pauper in the statutory sense although he did not receive his aid from the public authorities.

In *Saukville v. Grafton,* 68 Wis. 192, 31 N. W. 719, the person whose settlement was in question had had a legal settlement in Grafton and had been placed in a poorhouse in the town of Saukville, where he was supported by the town of Grafton until 1881. At that time the town of Grafton employed one Dengel, who resided in Saukville, to support him at $1 a week for about six weeks. Thereafter, he lived and worked for Dengel at Saukville for his board and room for a period of four years, after which Dengel refused to support him. The town of Grafton refused to support him. The town of Saukville did support him and brought action to recover from the town of Grafton. It was held that the alleged pauper had acquired no legal settlement in Saukville for the reason that he was, during all that time, depending on the charity of Dengel, and not upon his ability to support himself by his own labor. In this case the person involved was a pauper when he came to Dengel's. He was supported by Dengel as a pauper for six weeks, and thereafter was supported for four years, not out of motives of friendship or relationship, but as an act of charity to one already having the status of a pauper. The source and amount of support furnished are especially important in cases where they supply the only basis for an inference of pauperism. One would not suppose that the son of rich parents, who was entirely without property but was being adequately or even luxuriously supported by an allowance from home, could be considered to be a pauper or as being supported as a pauper. Nor is a person who, having been previously self-supporting, has lost his employment and is being supported by friends or relatives out of motives of friendship and family pride until there can be a turn in his fortunes, to be considered as a pauper. It is quite different where the public authorities or private charitable institutions are applied to and do support the person involved. There, unless some circumstance is pres-

ent such as is alluded to in the *Rolling Case,* it is clear that the support is referable to his condition as a pauper.

In this case Borgwardt, when he went to Ellington, had a business which he had purchased, had some income, and had some property which could be liquidated and applied to his support. He was supported principally by his father-in-law and made no claim upon the public authorities or upon any organized charity. We think that he did not become a pauper during the period of his residence in Ellington, and that, having lived in Ellington continuously for more than a year without being supported there as a pauper, he acquired a legal settlement in Ellington.

The next question is whether Borgwardt acquired a legal settlement in Dale on his return to that town. His condition during the first eight months of his residence in Dale did not materially change. He had available for his support the proceeds of his last life insurance policy and those from the sale of his automobile and other personal property. He still received the major part of his support from his father-in-law. If, under the circumstances, he had acquired a legal residence in Ellington, he was certainly in the process of establishing one in Dale during these eight months. It is urged that two circumstances interrupted this process. At some time after the eighth month of his residence in Dale, Borgwardt received, at his request, four sacks of flour from the town of Dale. This was not relief furnished at the expense of the town of Dale. The flour had been sent to the town by the Red Cross society for distribution to the families of the unemployed and needy. From the evidence, it appears that the flour was furnished without any restriction other than that it was to go to families who had the greatest need for it. We cannot believe that acceptance of this flour under these circumstances was sufficient to bring Borgwardt within the statutory definition of receiving support as a

pauper. We think that it cannot be held where the Red Cross society moves to alleviate the consequences of some public disaster that the result is to pauperize individuals who are the beneficiaries of the society's efforts. Had this flour been supplied by the town as a part of its statutory duty to care for the poor, a different question would be presented. However, the town merely distributed the donation to those having the greatest need for it, and this will not sustain a finding that Borgwardt was supported as a pauper during the first year of his residence in Dale. The other circumstance is that, just before the end of his first year's residence in Dale, Borgwardt did apply to the town of Ellington for relief. This relief was refused, and while it may constitute an admission of his poor financial condition, it fails as a matter of law to support the conclusion that he was being supported as a pauper for the reason that the requested support was refused.

It is the conclusion of the court that Borgwardt had established a legal settlement in Dale at the time of receiving relief in that town, and that the town of Ellington was under no liability to reimburse the town of Dale for his support. This conclusion makes it unnecessary to examine or determine several procedural questions that are raised by the town of Ellington.

*By the Court.*—Judgment affirmed.